IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF 6488 CAREFREE LN, APT 43, ROANOKE, VIRGINIA | Case No. 7:23mj106<br><br>**Filed Under Seal** |

### AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Brian P. McBride, having been duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the premises known as 6488 Carefree Ln, Apartment 43, Roanoke, VA (hereinafter "LOCATION 1"), further described in Attachment A, for the things described in Attachment B.

2. I am a Task Force Officer with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), and have been since approximately April of 2021. I am employed by the Roanoke County Police Department as a detective and have been a sworn law enforcement officer within the Commonwealth of Virginia for over nine years. During that time, I have conducted numerous firearms and narcotics investigations and have received specialized law enforcement training on the matter, to include cell phone investigations.

3. I have participated in the execution of numerous arrest and search warrants for criminal offenses involving the possession with the intent to distribute controlled substances and illegal possession of firearms. I am familiar with the methods drug and firearms traffickers use to conduct their illegal activities, to include communication methods, vehicle usage, text messaging, and narcotics transactions.

4.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5.     Based on the facts set forth in this affidavit, there is probable cause to believe that violations of Title 21, United States Code, Section 841(a)(1), relating to possession with the intent to distribute controlled substances have been committed, are being committed, and will be committed by INDIVIDUAL 1. There is also probable cause to believe that the locations described in Attachment A will contain evidence of these criminal violations.

6.     This affidavit is therefore submitted in support of an application for a search warrant and order for the search of LOCATION 1. The requested search warrant also includes the searching the data and information of wireless phones found in LOCATION 1 belonging to INDIVIDUAL 1.

## **PROBABLE CAUSE**

7.     In March of 2023, ATF TFO Matthew Knabb and other law enforcement personnel began purchasing quantities of methamphetamine from INDIVIDUAL 1 in Lynchburg, VA, utilizing a confidential source ("CS-1"). TFO Knabb conducted three controlled drug purchases of methamphetamine from INDIVIDUAL 1. During each of those controlled purchases, TFO Knabb put controls in place such as a live wire, a video recording device, pre-recorded US currency, a search of CS-1 before and after the transaction, and continuous monitoring of CS-1 during the transaction.

8.     During the third controlled purchase, law enforcement determined that CS-1 was an unreliable informant. CS-1 attempted to make an unauthorized side purchase of cocaine. TFO

Knabb discovered that CS-1 attempted to hide the cocaine in layers of skin in his or her abdomen. CS-1 was terminated for this misconduct and is pending criminal prosecution by the Commonwealth. However, based on the controls utilized during the three transactions, law enforcement remains confident that INDIVIDUAL 1 in fact sold CS-1 methamphetamine on each occasion.

9. Following the last controlled purchase in March 2023, INDIVIDUAL 1 was stopped for a traffic infraction in Lynchburg, VA, as well as for the violation of selling methamphetamine. Law enforcement also executed a state search warrant on INDIVIDUAL 1's alternate residence in Lynchburg, resulting in the discovery of several ounces of cocaine. This residence was the address of a family member of INDIVIDUAL 1, and INDIVIDUAL 1 was known to reside there while staying in the Lynchburg-area. In a post-*Miranda* interview, INDIVIDUAL 1 expressed interest in cooperating with law enforcement in hopes of receiving consideration on forthcoming criminal charges.

10. INDIVIDUAL 1 became a registered confidential informant for the Lynchburg Police Department. On March 31, 2023, TFO Knabb and other law enforcement personnel met with INDIVIDUAL 1 to register INDIVIDUAL 1 as an informant with the Lynchburg Police Department. INDIVIDUAL 1 acknowledged that he or she was not to possess or distribute any controlled substances unless authorized by law enforcement to do so in a controlled setting. TFO Knabb explained the process of how a controlled drug transaction would work to ensure that INDIVIDUAL 1 could comply with that protocol.

11. Law enforcement began utilizing INDIVIDUAL 1 to conduct controlled purchases. Between May and July 2023, INDIVIDUAL 1 conducted four controlled purchases of fentanyl from a main source of supply. INDIVIDUAL 1 used a cell phone to coordinate those

transactions with the source of supply and with TFO Knabb. During each controlled purchase, TFO Knabb utilized controls, such as a live wire, a video recording device, pre-recorded US currency, a search of INDIVIDUAL 1 and his or her vehicle before and after the transaction, and surveillance and monitoring of INDIVIDUAL 1 during the transaction.

12. As the investigation of the source of supply progressed, TFO Knabb obtained and executed three search warrants for text message content from the source of supply's phone account and recovered data from two of those search warrants. In those messages, TFO Knabb identified a previously unknown secondary number for INDIVIDUAL 1. TFO Knabb identified the number because he recognized messages that he had reviewed and photographed on INDIVIDUAL 1's phone before one of the controlled purchases. It appeared that immediately after that controlled purchase, INDIVIDUAL 1 texted the source of supply from the secondary phone number and placed an order for an additional half ounce of suspected fentanyl. Based on the context of the messages, it appeared that the two individuals subsequently met and completed the sale.

13. TFO Knabb reviewed another text message that was sent from INDIVIDUAL 1's phone number to his source of supply during the same controlled purchase. INDIVIDUAL 1 sent the source of supply a message indicating that the price for the transaction was $2,000. Law enforcement had been led to believe that the transaction price was $2,700. Although TFO Knabb photographed messages sent before and after that message, he has no record of that text message. TFO Knabb believes that INDIVIDUAL 1 either stole or otherwise misappropriated the excess government funds.

14. The discovery of the messages caused law enforcement to comprehensively review the investigative materials related to INDIVIDUAL 1. Law enforcement identified several factors

that, while less conclusive, further suggest that INDIVIDUAL 1 was engaged in unauthorized purchases of controlled substances. For example, before another controlled purchase, TFO Knabb reviewed a message on INDIVIDUAL 1's phone that read "I might be getting a half too." While INDIVIDUAL 1 provided a plausible explanation at the time, law enforcement now knows he was lying. Text messages recovered show that INDIVIDUAL 1 returned to his source of supply to purchase an additional half ounce of fentanyl approximately one hour after TFO Knabb met with INDIVIDUAL 1.

15. On August 9, 2023, TFO Knabb attempted to contact INDIVIDUAL 1 at his or her secondary phone number, as INDIVIDUAL 1 did not initially answer INDIVIDUAL 1's primary phone number. TFO Knabb sent a text message to the secondary number indicating that TFO Knabb wanted to meet up for a check in with "Drake," which is TFO Knabb's code name for INDIVIDUAL 1. TFO Knabb received a response that it was not Drake answering the phone. On August 14th, 2023, TFO Knabb contacted INDIVIDUAL 1 on his or her primary phone number. In that conversation, TFO Knabb informed INDIVIDUAL 1 that he had attempted to contact INDIVIDUAL 1 on his alternate phone number. INDIVIDUAL 1 acknowledged that he or she had observed the text message sent by TFO Knabb and that INDIVIDUAL 1 did not know who it was initially that sent that text message.

16. During the investigation of INDIVIDUAL 1's source of supply, a GPS was placed on the source of supply's vehicle pursuant to a federal search warrant. A review of the stop frequency report between June 14th, 2023 and July 20th, 2023 showed 25 stops to an address listed as 6503 Carefree Ln, Hollins, VA 24019. Your affiant knows that this area of Roanoke is commonly referred to as Hollins, and that 6503 Carefree Ln shares a parking lot with 6488 Carefree Ln, which is an adjoining building.

17. On August 18th, 2023, TFO Knabb executed a federal search warrant on INDIVIDUAL 1 and recovered three cell phones from him or her. One of these phones was unknown to law enforcement at that time. It is described as a TCL flip phone with no pass code and a phone number of (540) 581-4860.

18. Your affiant reviewed the content of the TCL flip phone pursuant to the search warrant. One text thread was with a contact listed by a nickname with the number (434) 229-2625. Of note, INDIVIDUAL 1 had identified someone by this nickname as a Lynchburg dealer of cocaine and marijuana during his or her initial debrief as a confidential informant. INDIVIDUAL 1 had also identified the dealer's phone number as (434) 229-2625. Between August 11, 2023 and August 12, 2023, INDIVIDUAL 1 and the other individual (2625) had this text message conversation:

   a. INDIVIDUAL 1: "Yo u get the water yet?"
   b. 2625: "I haven't talked to no one"
   c. INDIVIDUAL 1: "Yo bro I need 2"
   d. INDIVIDUAL 1: "They gave me there change all ready"
   e. INDIVIDUAL 1: "Yo?"
   f. 2625: "I hit you"
   g. INDIVIDUAL 1: "When ?"
   h. 2625: "How long you going to be I got down my girls way"
   i. INDIVIDUAL 1: "Bra need 4 and 2"

Relying on training and experience, your affiant knows "water" to be a slang term for PCP or marijuana. Your affiant also knows that in its full context the numbers 2, 4, and 2 are consistent with weights for a drug transaction.

19. A second text thread was located with (540) 529-9193. This number was not entered with a contact name, but your affiant knows it to be INDIVIDUAL 1's source of supply ("SOS") in the investigation discussed earlier. This text conversation took place on August 14, 2023:

    a. SOS: "He ain't up yet his phone going to VM how much u got"
    b. SOS: "I can call a couple other people"
    c. INDIVIDUAL 1: "3750 no shake all chunks and Im gone drop before u leave?"
    d. INDIVIDUAL 1: "So if its not right aint no need waisting ur time bro!!"
    e. SOS: "U might as well gone back"
    f. INDIVIDUAL 1: "U cant add"
    g. SOS: "He going to grab it he gone call me so I go het him then we coming to u"
    h. INDIVIDUAL 1: "Ok"
    i. INDIVIDUAL 1: "How much longer?"
    j. SOS: "He said he on his way home now"
    k. SOS: "I'm not riding wit no scale and u got the 200 for me because I'm doing a lil to much trying to get this shit for u
    l. INDIVIDUAL 1: "As long as u got that shit!"
    m. INDIVIDUAL 1: "**6488 Carefree LN**"

Your affiant knows "shake" and "chunks" to be terms for the texture of fentanyl and that scales are used to weigh drugs prior to transactions. Your affiant also believes that in its full context the number 3750 refers to the cost for a drug transaction.

    20. A third text thread was with a contact entered only as "Oshy" with the number (434) 221-6209. Several messages of note on August 16, 2023 involving "Oshy" were:

    a. INDIVIDUAL 1: "U still good on the homegirl"
    b. OSHY: "yea, I gt one zip left to finish th I'm gone holla"

"Homegirl" is a slang term for cocaine and "zip" is slang for an ounce quantity.

    21. The TCL flip phone was unable to be downloaded using forensic software. Your affiant manually went through the device, and the listed text messages are not a complete account of the content on it. They are merely listed to show indications of ongoing drug trafficking involving INDIVIDUAL 1.

    22. Two photographs of firearms were also located in the photo gallery of the phone. One photograph was of a silver revolver and dated July 19, 2023. The second photo was of an apparent 1911 style pistol with wooden grips dated July 27, 2023.



23. On August 28, 2023, your affiant spoke with Hall Associates, the management company of 6488 Carefree Ln. Your affiant was advised by a property manager that 6488 Carefree Ln, Apartment 43 was leased to INDIVIDUAL 1 and that they have received several complaints of narcotics distribution from that unit from other residents of the complex.

24. The property manager also advised that three people were living at 6488 Carefree Ln, Apartment 43 illegally. These included Tiffany FAST, Jessica TAYLOR, and a child. The manager went on to say that Hall Associates is currently in the process of evicting all parties from the property and has court proceedings with INDIVIDUAL 1 on September 14, 2023.

25. Based on the foregoing, there is probable cause that INDIVIDUAL 1 violated 21 U.S.C. § 841(a)(1) by distributing controlled substances.

*Characteristics of Narcotics Distribution*

26. Based upon your affiant's training, expertise, and experience, I am aware of the following:

a. Narcotic distributors routinely keep at their residence certain ledger books, telephone books, receipts, drug customer lists, photographs and other papers that identify co-conspirators and their locations or residences, which relates to the importation, transportation, purchasing and distribution of controlled substances and proceeds derived from said sales;

b. Narcotics distributors generate substantial profits as a result of drug dealing, often stored at their residence. They also often maintain on hand large amounts of United States currency in order to operate and finance their ongoing drug business;

c. Drug traffickers commonly "front" (i.e. provide on consignment) controlled substances to their clients and the aforementioned books, records, receipts, notes, ledgers, etc. are maintained where the drug traffickers have ready access to them.  It is common practice for large-scale drug dealers to hide contraband, proceeds and drug sales and records of drug transactions in secure locations within their residence, or about the curtilage of their residence, to conceal such items from law enforcement authorities;

d. When drug traffickers amass large proceeds from the sale of drugs, they often attempt to legitimize or "launder" these profits.  To accomplish this, drug traffickers may utilize methods including, but not limited to, domestic and foreign banks and/or financial institutions and their attendant services, such as securities, cashier's checks and money drafts, and documents reflecting these money laundering schemes can often be found at residences or stash locations;

f. Drug traffickers commonly have in their possession, on their person and/or at their residences, firearms, including but not limited to handguns, pistols, revolvers, rifles, shotguns, machine guns and other weapons and ammunition. Such firearms are used to protect and secure a drug trafficker's property and currency;

g. It is common for narcotics traffickers to possess and hide paraphernalia used to cut, weigh and package narcotics, including cutting materials, scales, and plastic baggies; other contraband including firearms; proceeds of narcotics transactions and records of narcotics sales in secure locations within their residence, over which they maintain dominion and control, so as to have ready access to and to conceal these items from law enforcement authorities;

h. Narcotics traffickers use motor vehicles to transport and/or store illegal narcotics, currency, and firearms. This may include the use of surreptitious compartments within these vehicles to store contraband and/or proceeds.

i. Drug traffickers commonly use electronic devices, including, but not limited to; cellular telephones and other mobile devices such as tablets, computers, facsimile machines, currency counting machines, telephone answering machines, computer software, portable hard disk drives, flash or USB drives, tapes, discs, CD, DVDs, and audio tapes to store records of drug sales, ledgers, supplier's/customer's contact information, financial records, images, audio/video recordings and other related documents related to the trafficking and sale of narcotics.

  j. From my training and experience, I am aware that drug traffickers commonly use cellular phones to source narcotics and plan sales of narcotics. As in any other modern day business, there are several methods used to conduct these communications. Drug traffickers often use telephone calls, text messages, social media platforms and other third party messaging applications to conduct drug related communications. I am aware that cellular phones often contain evidence of the purchase and sale of narcotics, records of drug sales, ledgers, supplier's/customer's contact information, financial records, images, audio/video recordings and other documents related to the trafficking and sale of narcotics. I am also aware that narcotics distributors commonly maintain more than one cellular phone at a time for the purpose of furthering their criminal activity.

  k. When individuals frequent a particular residence multiple times a day, and stay for only a few minutes, particularly when the residence has no signage indicating the location is some type of business, your affiant, based upon experiences as a narcotics trafficking investigator, is aware this activity is consistent with narcotics trafficking.

## CONCLUSION

27. There is probable cause to believe that INDIVIDUAL 1 stores illegal narcotics within LOCATION 1, and that evidence of the listed crimes, along with the fruits of such crimes, will be located at LOCATION 1. There is also probable cause that additional cell phones belonging to INDIVIDUAL 1 found in LOCATION 1 will contain evidence of the listed crimes.

28. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am

applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

29. Your affiant respectfully submits that there is probable cause for a warrant to search LOCATION 1 described in Attachment A and seize the items described in Attachment B.

Respectfully submitted,

/s Brian P. McBride

Brian P. McBride
Task Force Officer
ATF

Received by reliable electronic means and attested to by telephone on September 7, 2023

*Robert S. Ballou*
ROBERT S. BALLOU
UNITED STATES DISTRICT JUDGE